_____

No.  95-2841
_____

David R. Rauenhorst,                *
                                    *
     Petitioner,                    *
                                    *
     v.                             *  On Petition for Review from
                                    *  Federal Highway
United States Department of         *  Administration.
Transportation, Federal             *
Highway Administration,             *
                                    *
     Respondent.                    *

_____

Submitted: May 15, 1996

Filed:  September 12, 1996
_____

Before RICHARD S. ARNOLD, Chief Judge, MAGILL, Circuit Judge, and
     VAN SICKLE*, Senior District Judge.

_____

VAN SICKLE, Senior District Judge.


     David  Rauenhorst  seeks  review  of  the  Federal  Highway
Administration's (FHWA) decision to deny his request for a waiver
from the federal licensing standards for commercial truck drivers.

_____

     *The HONORABLE BRUCE M. VAN SICKLE, Senior United States
     District Judge for the District of North Dakota,
     sitting by designation.

We reverse the decision of the FHWA and direct the FHWA to consider

the application on its merits.

## I. BACKGROUND

Petitioner seeks review of the FHWA's decision to deny his application for a waiver of the federal regulation which requires binocular vision in order to qualify for a commercial driver's license.  Waivers are permitted if the Secretary of Transportation or his agent "decides that the waiver is consistent with the public interest and safe operation of commercial motor vehicles." 49 U.S.C. § 31136(e)(1).

The current relevant federal regulation, which has been in existence since 1937 in some form, denies commercial licenses for truckers who lack 20/40 (Snellen) vision in each eye with or without corrective lenses.[1]  49 C.F.R. § 391.41(b)(10) (emphasis added).  The current rule has been unchanged since 1971. 57 Fed. Reg. 6793, 6794 (Feb. 28, 1992).  For many years, however, drivers obtained commercial licenses under state laws even though they had the required vision in only one eye.  These monocular drivers did not have accidents at greater rates than drivers with the requisite vision in both eyes.

---

[1]In 1862, a Dutch ophthalmologist, Snellen, devised the familiar eye chart used to measure visual acuity.  The principal may be expressed as:

visual acuity =      distance at which the letter is read
                     distance at which letter should normally
                     be read

Thus, 20/20 vision means a subject has read a letter at 20 feet that was designed to be read at 20 feet.  20/40 vision means that a letter which should normally be read at 40 feet must be brought in to 20 feet before it is recognized.  Thomas D. Duane, Clinical Ophthalmology, vol. 1, 30.

3

In 1973, Congress passed the Rehabilitation Act to prevent discrimination against the disabled, including a provision to

prevent discrimination against the disabled in federally assisted programs. 29 U.S.C. § 794(a).  In 1978, Congress expanded this section to preclude discrimination in "any program or activity conducted by any Executive agency." Id. No "otherwise qualified individual with handicaps" would be subject to discrimination solely because of that handicap. Id. To answer the question of whether an individual is "otherwise qualified", the trier of fact will have to conduct an individualized inquiry in most cases. School Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 (1987).

In accordance with the 1978 amendment to 29 U.S.C. § 794(a), the Department of Transportation (DOT) conducted a review of monocular drivers in 1982.  This study indicated that monocular drivers should be permitted to receive commercial licenses as long as they drove within their limitations.  The DOT, however, did not commence a formal process to amend the regulation.

In 1984, Congress passed the Motor Carrier Safety Act (MCSA) in order to federalize traffic safety laws and to curtail the development of inconsistent safety regulations in neighboring states.  While some states had allowed monocular drivers to operate commercial vehicles under state law, the federalization process began to limit job opportunities for these individuals due to 49 C.F.R. § 391.41(b)(10).[2]  See 59 Fed. Reg. 50887, 50888 (Oct. 6, 1994) ("Adoption of the federal standard by many States, along with stepped-up enforcement at both the State and Federal levels, exposed these drivers to disqualification determinations . . . . Congress has insisted on uniform standards consistent with Federal

---

[2]In fact, more than 5,000 "unqualified" drivers were removed from interstate driving positions by the 1984 MCSA and other enforcement measures. 59 Fed. Reg. 50887, 50888 (Oct. 6, 1994).

5

regulations issued pursuant to the MCSA of 1984."). This Act contained the provisions authorizing the Secretary of

Transportation to waive a regulation if it was in the public interest and consistent with safety. 49 U.S.C. § 31136(e). The Senate Committee on Commerce, Science, and Transportation cautioned that the waiver provision "should be used with extreme care and should only be used if the Secretary has developed sufficient information to provide adequate assurance that such waiver will not adversely affect the safe operation of commercial motor vehicles." S. Rep. No. 424, 98th Cong., 2nd Sess. 8 (1994).

In 1990, the Americans with Disabilities Act (ADA) was signed into law in order to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It was stated in the House of Representatives Education and Labor Committee report on the bill that within two years of the effective date of the ADA, the DOT would review its regulations regarding qualifications for drivers of certain vehicle classifications. H.R. Rep. No. 485, 101st Cong., 2nd Sess., pt. 2, at 57 (1990). Congress expected that the DOT would make the necessary changes to its regulations in order to end unwarranted discrimination against the disabled.[3]

---

[3]The full relevant statement was as follows:

In light of this legislation [the ADA], the Committee expects that within two years from the date of enactment (the effective date of Title I of this legislation), the Secretary of Transportation will undertake a thorough review of these regulations to ascertain whether the standards conform with current knowledge about the capabilities of persons with disabilities and currently available technological aids and devices and whether such regulations are valid under this Act. The Committee expects that the agency will make any necessary changes within the two year period to bring such regulations into compliance with the law. (of course, a non-discrimination obligation on the part of the Department of Transportation also exists currently under section 504 of the Rehabilitation Act of 1973.). H.R. Rep. No. 485, 101st Cong., 2nd Sess., pt., 2, at 57 (1990).

<u>Id.</u>

The FHWA initiated an advance notice of proposed rulemaking on

possible changes to its vision requirements.  Concurrently, the FHWA contracted with Ketron, Inc. to "study the relationship between visual disorders and commercial vehicle motor safety." 57 Fed. Reg. 23370 (Jun. 3, 1992).

In order to determine what the safety standards for truck drivers should be, the FHWA decided to conduct a study in which they could compare experienced, visually-challenged drivers versus drivers who met the federal standards.  On March 25, 1992, the FHWA published a notice of intent to issue waivers for disabled drivers who met state safety standards but not federal regulations, pursuant to the 49 U.S.C. § 31136(e) waiver provision.  To qualify as a driver one must have possessed 20/40 (Snellen) vision in the better eye.  The FHWA found that there was a public interest in furthering the employment of qualified individuals with disabilities and the strict nature of the qualifications of the waivers would allow the FHWA to make sure they were consistent with the safe operation of motor vehicles. 57 Fed.  Reg. 23370, 23371 (Jun. 3, 1992).  See 49 U.S.C. § 31136(e).

On July 16, 1992, the FHWA declared that it would give waivers to this limited group of experienced commercial drivers with clean safety records.  Petitioner never applied to be a member of this test group.  He maintains that he was not aware of this program at the time.  The deadline for applications was extended from September 21, 1992 until December 31, 1992.  Therefore, a driver had nine months between the notice of intent for the commencement of the waiver program and the application deadline.  Over 3,700 applications were received and the FHWA granted waivers to 2,411 drivers. 59 Fed.  Reg. 50887 (Oct. 6, 1994).

The United States Court of Appeals for the District of Columbia Circuit vacated the waiver program and remanded the rule creating it in Advocates for Highway and Auto Safety v. Federal

<u>Highway Admin.</u>, 28 F. 3d 1288 (D.C. Cir. 1994).  The court reasoned

that since the FHWA acknowledged that its recent study failed to provide sufficient foundation upon which to propose a satisfactory vision standard for drivers, it was arbitrary and capricious for the FHWA to propose a waiver program as the agency could not satisfactorily determine whether the waiver would be contrary to public interest and consistent with the safe operation of commercial vehicles. Id. at 1294. See 49 U.S.C. § 31136(e). However, those who had already been issued waivers were "grandfathered" and continued to drive commercial vehicles after the court's decision. 59 Fed. Reg. 50887, 50889 (Oct. 6, 1994).

On remand from the United States Court of Appeals for the District of Columbia Circuit, the FHWA invited additional public comment and conducted a thorough review of the evidence. In an October 6, 1994 Notice of Determination, the FHWA announced that there was additional evidence to justify the issuance of waivers to experienced monocular drivers with clean safety records. Both information provided by the states and the FHWA's waiver study had demonstrated that the safety performance of monocular drivers actually exceeded the safety performance of drivers as a whole. 59 Fed. Reg. 50887, 50890 (Oct. 6, 1994).[4] The statistics confirmed that the granting of the waivers was consistent with public safety and that the public interest of making sure that commercial drivers were physically capable to drive these vehicles was met. Id. at 50891. After receiving comments from almost twenty interested parties, the FHWA made a final determination validating the waiver program on November 17, 1994. 59 Fed. Reg. 59386 (Nov. 17, 1994).

---

[4]The FHWA had revoked the waivers of 201 drivers of those originally approved, 180 of which were terminated due to the driver's failure to submit a monthly driving report on time and 21 of which were ended for failure to submit to a complete medical examination. 59 Fed. Reg. 50887, 50890 (Oct. 6, 1994).

On February 22, 1995, the petitioner filed an application for a waiver of the vision requirements of 49 C.F.R. § 391.41(b)(10).

He had driven for 22 years and for over 1 million miles without an accident. But on May 24, 1995, the FHWA Administrator denied the petitioner's request. The Administrator reasoned that even if a waiver was crafted so as to fit only the petitioner, the precedent created by this waiver would be the destruction of the relevant federal regulation. Thus, anyone who shared characteristics with the petitioner would be subject to the new lower waiver standard, not the requirement within the Code of Federal Regulations. Furthermore, the Administrator felt that a finding that the petitioner had many years of accident-free driving was not enough for the Administrator to determine if the public interest was being protected due to Congress' historical concern with driver safety. In essence, the Administrator believed that he could not justify the withdrawal of a 60 year old federal regulation based on one individual's petition.

The petitioner appeals the FHWA's denial of his petition for a waiver of 49 C.F.R. § 391.41(b)(10) so that he may legally operate a commercial vehicle.

## II.  STANDARD OF REVIEW

Under the Administrative Procedure Act, an agency action shall not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Advocates for Highway and Auto Safety, 28 F. 3d at 1293. The scope of review is "narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); Atlantic Tele-Network, Inc. v. Federal Communications Comm'n, 59 F.3d 1384, 1388 (D.C. Cir. 1995) (stating that review is "highly deferential"); Mt. Graham Red Squirrel v. Espy, 986 F.2d

13

1568, 1571 (9th Cir. 1993); see Mueller v. United States Envtl. Protection Agency, 994 F.2d 1354, 1356 (8th Cir. 1993) (citing Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416

14

(1971) ) ("As long as the [agency] considered all of the relevant factors and its decision contains no clear error of judgment, we will not substitute our judgment."). The agency, however, "must examine the relevant data and articulate a satisfactory explanation for its action." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; see Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974) ("The agency must articulate a rational connection between the facts found and the choice made.") (citation omitted).

## III.  DISCUSSION

Our key question is:  does the history of known factors and lapse of time reflect, on the part of the FHWA, an abuse of discretion, or arbitrary and capricious action not in accordance with law?

By the Motor Carrier Act of 1935, 49 Stat. 543, 546-7 (1935), Congress authorized federal regulation of motor carrier safety. Under this original act, the Secretary of Transportation "may prescribe requirements for . . . (1) qualifications of employees of a motor carrier." 49 U.S.C. § 31502(b).  In 1966, the Department of Transportation inherited the regulatory authority from the Interstate Commerce Commission (ICC).

In 1937, the ICC issued its initial vision standard which required "[g]ood eyesight in both eyes either without glasses or by correction with glasses." 49 C.F.R. 192.3 (1938).  Since the 1930s, the vision standard has been made more stringent.  In 1939, the standard was made more specific, requiring 20/40 (Snellen) in one eye and 20/100 (Snellen) in the other. 49 C.F.R. § 192.3(b) (Supp. 1939).  The standard was amended in 1952 to require 20/40 (Snellen)

15

vision in each eye, corrected or uncorrected. 17 Fed. Reg. 4424 (1952). "Field of vision" requirements and the ability to distinguish colors were added in 1964. See 57 Fed. Reg. 6793,

6794 (Feb. 28, 1992).

In 1970, the current vision standard was adopted "in light of discussions with the Administration's medical advisers." 35 Fed. Reg. 6458 (1970). Under this standard, an individual is qualified to drive a commercial vehicle if that person:

> has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected 20/40 (Snellen) or better with corrective lenses, distant binocular acuity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70 degrees in the horizontal Meridian in each eye, and the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber. 49 C.F.R. § 391.41(b)(10).

In 1973, Congress passed the Rehabilitation Act. Section 504 of that Act originally prohibited private employers participating in federally funded programs from discrimination against "otherwise qualified persons." In 1978, Congress passed the Rehabilitation Comprehensive Services and Developmental Disabilities Amendments, and expanded section 504 to read:

> No otherwise qualified individual with a disability ... shall, solely by reason of his or her disability ... be subjected to discrimination ... under any program or activity conducted by any Executive Agency. 29 U.S.C. § 794(a).

The 1978 amendment also required each executive agency to "promulgate such regulations as may be necessary to carry out" section 504's requirements. The DOT initially responded by commissioning Bartow Associates to conduct a comprehensive review of the evidence supporting vision standards applicable to monocular drivers. The Monocular Driver: A Review of Distant Visual Acuity Risk Analysis Data (Bartow Study) (Sept., 1982). The study found that previous research reporting a connection between monocular driving and safety had been based upon "small sample size and

17

dubious methodologies." Id. at 1. "Potentially spurious relationships, small samples, lack of controls, and the potential

dominance of other variables reduces the validity of much of the past research . . . In several studies, including one of 14,000 drivers, the most consistent result was a failure to find a direct relationship between poor static visual acuity performance and high accident rates for young and middle-aged drivers." Id. at 29. The Bartow Study further found that "recent studies that have correlated accident involvement measures with measures of visual field have consistently failed [to obtain] any significant relationships." Id. at 20.

According to the Bartow Study, much previous research had been flawed, because it failed to recognize that disabled drivers learn to drive within their limits. Monocular drivers learn effectively to use visual cues which do not depend upon binocular vision. Unfortunately, many previous studies used binocular drivers with one eye closed as subjects. Thus, the drivers used in these flawed studies were actually learning to drive with a single good eye during the experiment itself. Other studies used subjects who had recently lost a single eye and, therefore, had not adjusted to their disability. The Bartow Study concluded that the critical issue in safe driving is the driver's ability to recognize the limits of his capabilities and to drive within those capabilities.

In 1990, Congress, seeking to eliminate continued discrimination against persons with physical and mental disabilities, passed the Americans with Disabilities Act. By H.R. Rep. No. 485, 101st Cong., 2nd Sess., pt. 2, at 57 (1990), the agency was directed to "make any necessary changes within the two year period to bring such regulations into compliance with the law." As of this writing, the regulations have not been corrected.

In 1992, the FHWA employed Ketron, Inc., to study the relationship between visual disorders and commercial motor vehicle

19

safety.

The Ketron study found that:

A review and critical evaluation were conducted on the most significant scientific research directed at investigating the relationship between visual performance and driving for passenger, commercial, and aged/visually impaired motor vehicle operators. Many studies relating visual test performance to correlates of driver safety, such as accident and violation rates, have been reported since the last major revision of the CMV vision standard in 1970. Reports on new testing methods were reviewed, including contrast sensitivity, glare sensitivity, low-light visual acuity, and dynamic visual acuity. In general agreement with studies reported prior to 1970, these newer studies were able to demonstrate only weak relationships between measures of vision and correlates of driver safety. No study involving purely visual measures reported an empirical ability to identify unsafe drivers at a level that was substantially greater than had previously been demonstrated for tests currently called for in the standard or for new tests.

And, also:

Review of the historical research performed to provide a more adequate empirical specification of the vision standard both for drivers of passenger cars and CMV's suggests a fundamental limitation in terms of providing valid cutoff points for screening purposes. Numerous studies have shown that visual deficits are rarely the primary cause of major accidents. Typically, many factors are found to contribute.

However, despite these firm findings, and without any evidence to support its being presented, the Ketron study opined that: "Thus, no new study or synthesis of studies provided a definitive basis for extensive changes to the current CMV visual standard." U.S. Dept. of Transportation, Fed. Highway Admin., <u>Visual Disorders and Commercial Drivers</u> (Nov., 1989) p. IV.

In March of 1992, the FHWA undertook to select a group of monocular drivers to be licensed for a period of three years, or more if needed, to assist in the testing and redrafting of the vision requirements. 57 Fed. Reg. 10295 (Mar. 25, 1992). The test

21

program in its final form provides waivers only to drivers with

good driving records for at least three years and with vision in one eye meeting the existing federal standard of at least 20/40 (Snellen). 57 Fed. Reg. 23,370 (Jun. 3, 1992)

For the test program, the FHWA declared the following standards:

1.  The applicant must produce proof from an optometrist or ophthalmologist certifying that the applicant's visual deficiency had not worsened since his last examination by the state licensing agency, and that:
2.  vision in one eye is at least 20/40 (Snellen), corrected or uncorrected,
3.  the applicant is able to perform the driving tasks to operate a commercial motor vehicle
4.  hold a valid state commercial drivers license (CDL) or a non-CDL license to operate a commercial vehicle (CMV) issued after April, 1990
5.  have three years recent experience driving a CMV without:
    a.  license suspension or revocation
    b.  involvement in a reportable accident in which the applicant received a citation for a moving violation
    c.  conviction for driving a CMV while intoxicated, leaving the scene of an accident involving a CMV; or
    d.  more than two convictions for any other moving violation in a cmv.

57 Fed. Reg. 31458, 31460 (Jul. 16, 1992); see Advocates for Highway Safety, 28 F.3d at 1290-91.

In September of 1992, interested parties filed in the United States Court of Appeals for the District of Columbia Circuit a petition for review which challenged the waiver program. In Advocates for Highway and Auto Safety, 28 F.3d 1288, decided in August of 1994, the court held that the case arose under the MCSA of 1984 which directed the Secretary of Transportation to issue regulations establishing "minimal federal safety standards to ensure that. . . the physical condition of operators of commercial motor vehicles is adequate to enable them to operate such vehicles safely." 49 U.S.C. § 31136(a)(3). The Court held that the FHWA had failed to place into the record evidence to establish that it had

made a prior determination that a waiver was "consistent with the safe operation of commercial motor vehicles." Advocates for

<u>Highway and Auto Safety</u>, 28 F.3d at 1293-94.

In September of 1994, this court decided the case of <u>Breth v. United States Dep't of Transp.</u>, 36 F.3d 1100, 1994 WL 487354 (8th Cir. 1994).[5]  The petitioner filed a petition for review of a decision of the FHWA denying his petitions for admittance into the waiver program and for an individual waiver.  This court held that after the decision in <u>Advocates for Highway and Auto Safety</u> terminated the test program, the only issue was the propriety of the Administrator's denial of the petition for an individual waiver.  <u>See</u> 49 U.S.C. § 31136(e)(1).  This court sent the matter back to the Administrator because he did not articulate his reasons for denial of the petition.

Following the District of Columbia Circuit's decision in <u>Advocates for Highway and Auto Safety</u>, the FHWA reviewed its evidence and concluded that, referring to available state evidence and its own records, it should, and did, reissue the waivers to the existing experimental group of drivers.  In so doing, it continued its study program and complied with the dictate that agencies should be engaged in a continuous process of examining their policies and assuring the results of the new data were correctly taken into account. <u>See</u> <u>National Labor Relations Bd. v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 151 (1975).

In justification for the reissuance of the waivers, the agency based its requirement that drivers participating in the study have a three-year safe driving record upon studies which indicated that

_____

[5]Although unpublished, this court feels it is relevant to these proceedings.  <u>See</u> Eighth Circuit Rule 28A(k) ("Parties may also cite an unpublished opinion of this court if the opinion has persuasive value on a material issue and no published opinion of this or another court would serve as well.")

past experience could predict future performance, especially when combined with other factors such as geography, mileage driven, and

conviction history. <u>See</u> 59 Fed. Reg. 50888 (1994). "Statistical studies", the FHWA continued, "support the proposition that accident-free performance combined with low numbers of traffic violations over a three-year period is [a] reliable predictor of continued safe performance over a similar period in the future." The agency also relied upon the medical community's determination that people with vision impairments can often compensate for that impairment over a period of time. <u>Id.</u> The FHWA concluded that "the driving performance of individuals participating in the vision waiver program is better than the driving performance of all commercial vehicle drivers collectively." <u>FHWA Interim Monitoring Report on the Drivers of Commercial Motor Vehicles</u>, 3 (1994).

In February of 1995, Rauenhorst, the petitioner herein, applied for a waiver. In his application, he showed that he had monocular vision, that he had driven commercial vehicles for 22 years, and had driven more than a million accident-free miles. His application was denied. The Administrator reasoned that it could not conduct an individual determination of an appropriate waiver because anyone else meeting the criteria under which such a waiver is issued would thereafter be likewise entitled to a waiver. Although each waiver issued under 31136(e) would be crafted so narrowly as to fit only the immediate applicant, it actually becomes the new, lower standard upon which all subsequent applications will be judged. Administrative Decision p 6. The Administrator reasoned that anyone else meeting the criteria under which a waiver was issued would also be entitled to a waiver under 49 U.S.C. § 31136(e), thus actually creating a new lower standard than that published in the Code of Federal Regulations.

This reasoning completely defeats any statutory provision for waivers for cause. It cements in place obsolete or inaccurate administrative standards, even when these standards are replaced by

27

new benchmarks which are carefully drafted to assure that

improvements and developments in the equipment of the vehicles and additional developments as to the nature and adaptations to a disability can and do compensate successfully for certain disabilities. The reasoning of the Administrator's decision distorts the purpose of an authorization in the basic statute for the granting of waivers.

After the petitioner in Breth's claim was remanded to the FHWA, the agency did not issue an administrative decision granting Breth a permanent waiver under 49 U.S.C. § 31136(e). But the FHWA did enter into a compromise settlement agreement that allowed Breth to participate in the reconstituted waiver study program. Respondent's Brief, 44. Given the waiver provisions of the MCSA and the mandates of the Rehabilitation Act and the ADA, the FHWA cannot now maintain that, despite this petitioner's compliance with the limitations imposed upon Breth, the granting of a waiver of the vision regulation for commercial drivers should automatically be denied in Rauenhorst's case.

To justify its position, the FHWA relies on Buck v. United States Dep't of Transp., 56 F.3d 1406 (D.C. Cir. 1995), and Ward v. Skinner, 943 F.2d 157 (1st Cir. 1991), cert. denied, 503 U.S. 959 (1992). Buck falls into the same category as Advocates for Highway and Auto Safety. Buck involved three deaf truck drivers who sought a waiver of the FHWA's minimum hearing requirement. But the agency had insufficient empirical evidence to justify a wholesale change. In that case, the FHWA properly required that the petition be denied.

In Ward, an epileptic commercial vehicle operator who took an anti-convulsant medicine to control his epilepsy, challenged a refusal to grant a waiver. The FHWA found that it could not conclude that allowing an epileptic a license to operate a truck

29

was consistent with the public interest and the safe operation of motor vehicles.

Certainly, an element in any safety program involving disabled persons requires judgment calls related to the type of disability. For example, a condition imposed upon the monocular drivers now given waivers is that they establish that their visual acuity is stabilized. In this respect, as in the case of deafness, this may be a not unusual condition. But the control of epileptic seizures by a tightly-disciplined taking of drugs may well represent a greater risk.

The government claims that applying tests or standards to determine that a waiver is appropriate in a particular instance amounts to a rulemaking. Therefore, the government contends, granting relief under those standards should first be handled through a formal rulemaking proceeding. But 6 years ago, in 1990 Congress expressed its will that the applicable standards be redrafted to assure that the Americans with Disabilities Act furnished relief for disabled persons being denied access to those activities within their capacity to perform. The administrator can hardly justify settling the lawsuit with Breth by granting a waiver unless Breth's capacity to do commercial driving assures reasonable safety to other highway users. Until the administrative standard for waivers to monocular drivers is revised to reflect the current knowledge the administrator must grant separate, individually tailored waivers. Inevitably specific waivers must be grounded on specific tests or standards. Otherwise, administrators would be granting waivers not as a matter of the employee's capacity to function, but as a matter of the administrator's personal whim.

In this case, the Administrator has produced a decision which is arbitrary and capricious and otherwise not in accordance with law. The FHWA has failed to articulate a satisfactory explanation for its action in this matter. The decision not to evaluate the

Rauenhorst application on its merits is reversed and remanded for further proceedings.

REVERSED AND REMANDED.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.