Hallie KIRKINGBURG, Plaintiff–Appellant,

v.

ALBERTSON'S, INC., Defendant–Appellee.

No. 96–35002.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 1997.

Decided May 11, 1998.

As Amended July 1, 1998.

---

Scott N. Hunt (argued), Richard C. Busse, Busse & Hunt, Portland, Oregon, for the plaintiff-appellant.

Corbett Gordon, Portland, Oregon, for the defendant-appellee.

Before: GOODWIN, REINHARDT, and RYMER, Circuit Judges.

REINHARDT, Circuit Judge:

Hallie Kirkingburg, a monocular-visioned truck driver, filed an action in district court alleging that his employer, Albertson's, Inc. discriminated against him on account of his visual disability in violation of the Americans with Disabilities Act ("ADA" or "the Act"). 42 U.S.C. § 12112(a) (1994). Albertson's moved for summary judgment, arguing that Kirkingburg had not established a prima facie case under the ADA. The district court agreed with Albertson's and granted summary judgment in its favor. Kirkingburg appeals. We hold that the granting of summary judgment to Albertson's was erroneous.

## The Facts

Since 1979, Hallie Kirkingburg has been driving commercial trucks. His driving record is impeccable—he has been in only one accident, which was determined to be not his fault, and he has received no citations for moving violations. In 1990, Albertson's hired Kirkingburg as a driver at its distribution center in Portland, Oregon. Prior to starting work for Albertson's, Kirkingburg was examined by a physician who certified that his vision met the requirements established under Department of Transportation ("DOT") regulations.[1] Kirkingburg also performed well on a 16–mile road test that Albertson's administered before it offered him the job. Following the road test, Albertson's transportation manager stated that "It is my considered opinion that [t]his driver possesses superior driving skill to operate safely the type of commercial vehicles listed above." Several months into the job, Kirkingburg was again examined by a physician and his vision was recertified.[2] Notwithstanding these medical certifications, the visual acuity of Kirkingburg's left eye is, and has been since birth, rated 20/200, well below what the general DOT regulations require. The poor vision in his left eye is caused by amblyopia, a condition commonly referred to as "lazy eye," which cannot be corrected. His right eye, however, has a visual acuity rating of 20/20 (with corrective lenses). In short, Kirkingburg's vision is monocular.

In late 1991, after he had been on the job for over a year, Kirkingburg suffered a non-driving, work-related injury when he fell from a truck. As a result of the accident, he did not return to work for almost a year. Albertson's policies require employees who are resuming work after a long-term absence to secure recertification under the DOT standards, and in November 1992, Kirkingburg's vision was again examined. This time, the examining physician correctly determined that the vision in Kirkingburg's left eye was 20/200. Accordingly, the doctor refused to certify him under the DOT regulations and informed Albertson's of these findings.

1. According to the DOT regulations, operators of commercial motor vehicles should have a "distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, [and] distant binocular acuity of at least 20/40 (Snellen) with or without corrective lenses." 49 C.F.R. § 391.41(b)(10).

2. Both medical examinations revealed that Kirkingburg's vision did not meet the applicable standards; neither examination, however, correctly appraised Kirkingburg's actual visual acuity. It is not clear why Kirkingburg received a certification on these two occasions in spite of his failure to meet the required standards.

When Kirkingburg was denied DOT certification, he applied for a waiver of the regular vision requirements under the Federal Highway Administration's ("FHWA") vision waiver program, which was instituted in order to bring DOT's standards into compliance with the ADA without sacrificing highway safety. The establishment of this program fulfilled Congress's expectation that DOT would revise its safety regulations in order to end unfounded discrimination against drivers with visual disabilities. *See generally Rauenhorst v. United States Dep't of Transp., Fed. Highway Admin.*, 95 F.3d 715 (8th Cir.1996) (detailing the history of the FHWA vision waiver program). Under the program, FHWA makes vision waivers available to certain experienced commercial truck drivers who have clean driving records.

In order to obtain a vision waiver under the FHWA program, the applicant, among other things, is required to establish that he has three years of recent experience driving a commercial vehicle without (1) license suspension or revocation, (2) involvement in a reportable accident in which the applicant received a citation for a moving violation, and (3) more than two convictions for any other moving violation in a commercial vehicle. 57 Fed.Reg. 31,458 (1992). In addition, the applicant is required to present proof from an optometrist certifying that his visual deficiency has not worsened since his last examination, that the vision in one eye at least is correctable to 20/40, and that he is "able to perform the driving tasks required to operate a commercial motor vehicle." *Id.* at 31,-460. In other words, DOT will waive its regular vision requirements for commercial vehicle drivers, such as Kirkingburg, who have monocular vision, are able to drive well despite that disability, and have good driving records.

Kirkingburg informed Albertson's that he had applied for a waiver under the program, but Albertson's explained that it would not accept a waiver because it had a policy of employing only drivers who "meet or exceed the minimum DOT standards." Consequently, Albertson's fired Kirkingburg from his position as a truck driver. Several months later, when Kirkingburg informed Albert-

son's that he had in fact obtained a vision waiver, Albertson's once again refused to accept it and declined to reconsider his termination. Kirkingburg brought suit, alleging that Albertson's discriminated against him in violation of the ADA.

## DISCUSSION

### The Americans with Disabilities Act

■ When Congress enacted the Americans with Disabilities Act in 1990, it sought to eliminate the barriers that prevent disabled individuals from becoming fully participating members in all aspects of their communities, particularly in the area of employment. In furtherance of Congress's expansively stated goal of equality, the Act prohibits covered employers from engaging in employment practices that discriminate against individuals with disabilities. Specifically, the ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1994). The ADA contemplates that a person with a disability will be evaluated on the basis of his individual capabilities, not on the basis of society's biases or an employer's preconceptions.

■ In this case, Kirkingburg claims that his employer violated the ADA by firing him because of his visual disability. In order to survive a motion for summary judgment, Kirkingburg must demonstrate a genuine issue of material fact regarding: (1) whether he is a disabled person within the meaning of the ADA; (2) whether he is otherwise qualified for the position, that is, whether he is able to perform the essential functions of the job, with or without reasonable accommodation; and (3) whether the employer terminated him because of his disability. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996). Albertson's contends that Kirkingburg is not entitled to relief under the ADA because he is neither disabled nor an otherwise qualified individual. We examine whether Albertson's has established that it is entitled to summary judgment with respect

**1232**

to these two elements of Kirkingburg's ADA claim.[3]

### 1. Disabled

 Albertson's first contends that Kirkingburg failed to raise a genuine issue of fact regarding whether he is disabled within the meaning of the ADA. We disagree with Albertson's argument that anything short of "legal blindness" in both eyes is insufficient to establish a disability under the ADA—it is clear that a person who is blind or practically blind in one eye is disabled within the meaning of the Act.

In determining what constitutes a disability under the ADA, we are guided by the definition of the term in the statute, which states that a "disability" is:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The implementing regulations further clarify the statutory definition of a disability. Under the regulations, an impairment is substantially limiting if it "significantly restricts as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii) (1993) (emphasis added). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. at § 1630.2(i) (emphasis added). In addition, the regulations enumerate the following factors that should be considered in determining whether an individual is substantially limited in a major life activity: "(1) the nature and

severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Id. at § 1630.2(j)(2).

Kirkingburg has presented uncontroverted evidence showing that he suffers from amblyopia, a condition resulting in his being almost totally blind in his left eye. In short, he has monocular vision. Given the nature of the condition and its permanence, there is no question that Kirkingburg is substantially limited in the major life activity of seeing. Kirkingburg's inability to see out of one eye affects his peripheral vision and his depth perception. Although his brain has developed subconscious mechanisms for coping with this visual impairment and thus his body compensates for his disability, the manner in which he sees differs significantly from the manner in which most people see. To put it in its simplest terms, Kirkingburg sees using only one eye; most people see using two. Accordingly, under the statute and implementing regulations, if the facts are as Kirkingburg alleges, he is disabled.

 The Eighth Circuit recently decided an almost identical question. In Doane v. City of Omaha, 115 F.3d 624, 627–28 (8th Cir.1997), cert. denied, — U.S. —, 118 S.Ct. 693, 139 L.Ed.2d 638 (1998), that court held that a monocular-visioned person, who could see out of only one eye because of glaucoma, was "disabled." That the individual had learned to compensate for the disability by making subconscious adjustments to the manner in which he sensed depth and perceived peripheral objects did not change his disabled status. Id. at 627–28. It was enough to warrant a finding of disability, the court held, that the plaintiff could see out of only one eye: the manner in which he performed the major life activity of seeing was different.[4] Id. at 627.

---

3. There is no dispute regarding the third element of Kirkingburg's ADA claim; if he is disabled, he was terminated because of the disability.

4. Recently, the Fifth Circuit held as a matter of law that a monocular-visioned individual was not disabled because he was "able to perform normal daily activities." Still v. Freeport–McMoran, Inc., 120 F.3d 50, 52 (5th Cir.1997). We think

this reasoning is inconsistent not only with the regulations, but with the Act itself. Whether an individual is disabled within the meaning of the Act does not depend, contrary to the Fifth Circuit's suggestion, on whether the individual can go about his daily business in spite of the impairment. Instead, the appropriate inquiry in cases such as this is whether, as a result of a physical impairment, the individual is required to per-

■ Albertson's contention that Kirkingburg is not disabled because he is not totally blind is plainly inconsistent with the expansive goals of the ADA. The Act was drafted in broad language in order to protect a large class of physically impaired individuals from unwarranted discrimination—it was not drafted narrowly to protect only those with the most severe disabilities. *See Arnold v. United Parcel Svc., Inc.*, 136 F.3d 854, 861 (1st Cir.1998) ("Conceptually, it seems more consistent with Congress's broad remedial goals in enacting the ADA, and it also makes more sense, to interpret the words 'individual with a disability' broadly, so the Act's coverage protects more types of people against discrimination.").

■ We also note that an expansive reading of the statutory definition of a "disability" does not leave employers unduly exposed to liability. The ADA does not require employers to hire or retain in service any person who is not capable of doing his job properly. It merely prohibits employers from discriminating against qualified workers on account of their disabilities. The Act contains several provisions that adequately protect the employer's interests. For example, an individual seeking the protection of the Act must demonstrate that he is "qualified" for the job in spite of his impairment. 42 U.S.C. §§ 12111(8), 12112(a). And, if accommodations are necessary to enable the employee to perform the essential functions of the job, an employer will only be required to make such accommodations if they are "reasonable," in light of the costs or other burdens they impose on the employer. *Id.* at § 12111(9), (10).

■ As an alternative ground for our decision, we note that there exists a genuine issue of fact regarding whether Albertson's perceived Kirkingburg as disabled. Thus, even if Kirkingburg were not disabled, his employer's perception of him as having a disability would be sufficient to bring him under the coverage of the Act. 42 U.S.C. § 12102(2)(C). Because Kirkingburg has presented evidence showing that one of Albertson's managers described him as "blind in one eye or legally blind," he has established a genuine issue as to whether his employer believed he was disabled.

## 2. Qualified

■ Under the ADA, Kirkingburg must show not only that he suffers from a disability, but also that he is a "qualified individual." *Lucero v. Hart,* 915 F.2d 1367, 1371 (9th Cir.1990). In this regard, Kirkingburg must establish (1) that he "satisfies the requisite skill, experience, education and other job-related requirements of the employment position [he] holds," and (2) that with or without reasonable accommodation, he can perform the essential functions of the position. 29 C.F.R. § 1630.2(m); *see also Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 807–09 (5th Cir.1997) (elaborating on the proper inquiry). We address the two requirements, beginning with the latter.

### a. Essential Functions

■ Kirkingburg has, at the least, established a genuine issue of material fact with respect to whether he can perform the essential functions of a commercial truck driver. The regulations define the term "essential functions" to mean: "the fundamental job duties of the employment position." 29 C.F.R. § 1630.2(n). There is no question that Kirkingburg's experience as a commercial truck driver, and in particular his year of experience as a truck driver for Albertson's, is evidence from which a reasonable factfinder could conclude that Kirkingburg is able to perform the essential functions of the job. More pertinent to the issues in this case, as we will discuss more fully below, is the fact that Kirkingburg received a FHWA waiver based in part on his excellent driving record.

Albertson's maintains that an "essential function" of the job is Kirkingburg's ability to meet DOT safety regulations and that because he cannot meet the standards, he is unable to perform an essential function. We think this argument is more properly considered as a challenge to whether Kirkingburg

---

form a major life activity in a different manner from other persons. Notably, the *Still* court did not cite or discuss 29 C.F.R. § 1630.2(j)(1)(ii) in reaching its decision. Accordingly, we agree with the Eighth Circuit's analysis and reject the Fifth Circuit's.

has satisfied the job-related requirements. Accordingly, we turn to that issue.

### b. Job-related Requirements

 In one sense, the question in this case is the traditional one—whether Kirkingburg satisfies the first prong of the "otherwise qualified" test, that is, whether he can satisfy the pertinent job-related requirements. Ultimately, however, the dispositive question is actually whether Albertson's job-related requirement that Kirkingburg fails to meet is lawful as applied. Albertson's maintains that Kirkingburg cannot show that he is qualified because he cannot fulfill its requirement of meeting or exceeding the regular DOT vision standards. In this respect, Albertson's makes two separate arguments. First, it contends that federal law mandates that it require that its drivers meet the regular DOT vision standards.[5] Second, it asserts that, independent of its obligation to ensure compliance with federal law, it has the right to adopt the regular DOT vision standards as its own, and that its refusal to accept FHWA waivers is justified because drivers who do not meet the basic standards pose a direct safety threat. In turn, Kirkingburg challenges the legality of Albertson's requirements and its refusal to recognize his FHWA waiver.

### (i) Compliance with Federal Law

As to Albertson's first contention, we think the answer is obvious. Because the FHWA waiver program is part of federal law and recognizing FHWA waivers is perfectly consistent with federal law, Albertson's cannot justify its adoption of the regular DOT vision standards as a job-related requirement by asserting that federal law requires its drivers to meet those standards regardless of whether they are qualified for and obtain FHWA

waivers. Albertson's has not simply conformed its job requirements to the relevant DOT regulations; rather, it has chosen to adhere to only a part of the regulations, while ignoring the waiver program.

By refusing to accept FHWA waivers, Albertson's has rejected a portion of the federal scheme that was specifically designed to eliminate the discriminatory effects of the DOT safety regulations and bring those regulations into compliance with the ADA. *See Rauenhorst v. United States Dep't of Transp., Fed. Highway Admin.*, 95 F.3d 715, 716–17 (8th Cir.1996). The waiver program was the result of Congress's expectation that DOT would review its regulations in light of the ADA's mandates and "make the necessary changes to its regulations in order to end unwarranted discrimination against the disabled." *Id.* at 717 (footnote omitted). Allowing Albertson's to prevail in this argument would deal a serious blow to the FHWA's efforts to establish regulations that conform to the requirements of the ADA, in particular the Act's mandate that disabled persons be evaluated in light of their individual abilities.

Apparently hoping to convince us that the waiver program is not a legitimate part of the federal regulatory scheme, Albertson's contends further that it should not be compelled to accept a DOT waiver because: (1) the waiver program is experimental, and (2) it has been invalidated by the D.C. Circuit. *See Advocates for Highway & Auto Safety v. Federal Highway Admin.*, 28 F.3d 1288 (D.C.Cir.1994). Neither of these arguments is meritorious.

The waiver program, which was instituted in July 1992, has been adjudged a success by the FHWA. *See* 59 Fed.Reg. 59,389 (1994) (determining, after two years of study, "that

---

5. Albertson's invokes *Buck v. United States Dep't of Transp.*, 56 F.3d 1406 (D.C.Cir.1995), for the proposition that it should not be compelled to employ a driver who cannot satisfy the regular federal safety standards. In *Buck*, three deaf truck drivers argued that under the Rehabilitation Act (after which the ADA is modeled), "it [was] unlawful for the agency to rely upon a general rule applicable to all hearing-impaired individuals without regard to their actual ability to drive a truck safely." *Id.* at 1408. The D.C. Circuit rejected the petitioners' argument, finding that the implementation of general safety

standards by the FHWA and the agency's *refusal* to establish a waiver program is not violative of the Rehabilitation Act if insufficient evidence exists justifying such waivers. *Id.*

*Buck* is clearly inapposite to this case. Here, the FHWA *has* created a waiver program for vision-impaired drivers. The decision to implement the program was well supported by empirical evidence that a number of drivers who do not meet the otherwise applicable vision standards are nevertheless able to operate commercial vehicles safely. Moreover, the FHWA has determined that Kirkingburg is one of them.

the issuance of waivers to the 2,399 drivers remaining in the study group is consistent with the public interest and the safe operation of commercial motor vehicles"). The success of the program is no surprise, given that waiver recipients are selected on the basis of individual evaluations, under exacting standards. Only drivers who have exemplary driving records are eligible. Contrary to what Albertson's would have us believe, there is no evidence whatsoever that drivers who have been certified to drive under the waiver program are less safe than drivers who have been certified under the ordinary standards. In fact, quite the opposite appears to be true. In an interim report, the FHWA concluded that "the driving performance of individuals participating in the vision waiver program is better than the driving performance of all commercial vehicle drivers collectively." [6] *FHWA Interim Monitoring Report on the Drivers of Commercial Motor Vehicles*, 3 (1994).

Albertson's also contends that it was not required to accept the FHWA waiver because the D.C. Circuit invalidated the program in 1994. We do not think Albertson's can justify its termination of Kirkingburg and its refusal to accept the waiver on the basis of events that occurred long after its decisions.[7] *See O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759–61 (ex

plaining that evidence of a justification not known to the employer at the time of discharge cannot serve to justify the termination). Additionally, there is nothing in the record before us that suggests that Albertson's decision in November 1992 not to accept the waiver was based on its belief that the program had been invalidly adopted. Instead, on the record before us, it is undisputed that when Albertson's terminated Kirkingburg and refused to accept the waiver, it was *not* because it believed that the program had been invalidly adopted. Rather, the record reflects that Albertson's refused to accept the waiver simply because it believed that it could continue to require its drivers to meet the regular DOT vision standards notwithstanding the lawful issuance of a waiver by the FHWA. In a letter to the Oregon Bureau of Labor & Industries, dated August 23, 1993, Albertson's stated: "Albertson's does not employ drivers who do not meet minimum DOT requirements. The fact that Mr. Kirkingburg applied for and received a waiver of the DOT vision requirements, does not mean that he meets the minimum qualifications of a DOT driver."

■ As we discussed above, Albertson's was not free to disregard the waiver program for the reasons it asserted at the time it fired Kirkingburg. Because there is no evidence in the record indicating that Albertson's be

---

**6.** In fact, the excellent safety records of the waiver program participants was cause for reevaluating the program's research methods with respect to its ultimate purpose: to alter the regular vision standards permanently. 59 Fed.Reg. 59386, 59388–90 (1994). To the extent that the program was a "failed experiment," as Albertson's alleges, it was not a failure in terms of the safety performance of those to whom waivers were granted. Its only "flaw" was that preselecting monocular drivers with extraordinary safety records resulted in what may have been an unrepresentative and super-safe group of drivers.

Detractors of the program successfully argued to the agency that because only the safest drivers were granted waivers, the safety records of waiver recipients were not reliable indicators of the potential safety records of all monocular-visioned drivers. *Id.* at 59389. Thus, the detractors concluded, the success of the waiver program should not serve as a basis for modifying the regular vision standards so as to render *all* monocular persons qualified to drive commercial trucks. The FHWA agreed and concluded that it needed to adopt a new research method "to develop

parameters for performance-based visual standards" that "reflect the actual physical requirements that foster[ ] safe operation of commercial vehicles." *Id.* at 59389–90. But the agency's decision to change its research methods is of no help to Albertson's in this case, because the decision was based on the highly *successful* track records of the carefully selected group of waiver recipients, including Kirkingburg.

**7.** In some respects, this question is analogous to that presented in after-acquired evidence cases in which an employer subsequently discovers a lawful justification for its previously unlawful action. *See O'Day*, 79 F.3d at 758. The general rule in those cases is that the employer cannot use such justifications to support the discharge. However, while it is appropriate in those cases to permit the employer to use the evidence in order to limit the amount of damages it must pay, the after-acquired evidence in this case probably would not affect Kirkingburg's damage award, because the new justification does not involve employee wrongdoing and the FHWA revalidated the waiver program following the D.C. Circuit's decision.

lieved the waiver program to be invalid when it terminated Kirkingburg or that it relied upon any such belief as a basis for its refusal to accept the FHWA waiver, we need not decide whether such a belief would shield it from liability, or whether it might instead have been required to challenge the validity of the waiver program in an administrative proceeding. We leave these questions to the district court should they become relevant on remand. We emphasize that because we are reviewing a summary judgment motion, we do not finally resolve any issues that may be dependent on the introduction of further admissible evidence at trial.

In any event, the D.C. Circuit invalidated the waiver program in 1994 not because it was inconsistent with public safety, but because the FHWA instituted the program without complying adequately with administrative procedures. *See Advocates*, 28 F.3d at 1294. When the case was remanded to the FHWA for further consideration after the court's decision, the agency conducted the appropriate notice and comment procedures and once again concluded that the waiver program was a desirable measure in light of both safety concerns and the goals of the ADA. No challenge has been made to that decision, and the statutory provision allowing the FHWA to grant waivers to vision-impaired drivers remains in effect. 49 U.S.C. § 31136(e)(1). In fact, last year, the FHWA granted at least one waiver to a monocular-visioned driver. 62 Fed.Reg. 35,-881 (1997). Thus, we reject Albertson's argument that the waiver program is not a lawful and legitimate part of the DOT regulatory scheme.[8]

### (ii) Direct Safety Threat

Alternatively, Albertson's maintains that its independent adoption of the regular DOT vision standards without the waiver provision, as a *job-related requirement*, is consistent with the ADA. It asserts that requiring compliance with the regular DOT vision standards is necessary to prevent visually-impaired employees from "pos[ing] a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). In other words, it argues that recognizing the FHWA waivers would constitute a direct safety hazard.

The practical effect of Albertson's argument is to seek to have us declare the waiver program invalid. We seriously question our jurisdiction to do so in the context of these proceedings. We doubt that a business that operates in the highly regulated commercial transportation industry is free to challenge generally applicable FHWA regulations in private litigation. In particular, our concern is that allowing such a challenge would effectively permit a regulated entity to circumvent the specific scheme for judicial review of FHWA regulations that Congress carefully established in the Administrative Orders Review Act (commonly known as the Hobbs Act).[9] 28 U.S.C. §§ 2321, 2342. Because the parties have not addressed this question, however, we will not decide it here, leaving it to the district court to do so initially, should further proceedings following remand make such a determination appropriate or necessary.

In any event, Albertson's has simply failed to produce any evidence that Kirkingburg and other waiver recipients pose a direct safety threat. Under the statute, a direct threat is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." *Id.* at § 12111(3). A "significant risk" means a high probability of harm that is neither

---

**8.** The dissent asserts that the waiver program is not part of the regulatory scheme. That is not correct. The statute governing the DOT safety standards specifically includes a provision allowing for waivers of the regular standards and we consider the "scheme" to include all the relevant rules, regulations, and statutory provisions.

**9.** The Hobbs Act governs judicial review of rules, regulations, and final orders of a handful of agencies, including the Interstate Commerce Commission, under which authority the FHWA

acts. For a discussion of the Hobbs Act and its purposes, see *Carpenter v. Department of Transportation*, 13 F.3d 313 (9th Cir.1994). *Carpenter*, a pre-waiver program case, involved a driver with monocular vision who had been disqualified from driving when the FHWA found that he did not meet the applicable vision standards. The driver brought an action in federal district court, claiming that the regulations violated his civil rights. We dismissed the claim, finding that the Hobbs Act "requires that such a challenge be brought only in the court of appeals." *Id.* at 314.

remote nor speculative. 29 C.F.R. § 1630.2(j). Drivers who qualify for the waiver program have necessarily established to the satisfaction of the agency charged with ensuring highway safety that they do not pose a safety threat at all.[10] Denying a monocular-visioned driver the opportunity to work, in spite of his having demonstrated that he is capable of performing the job safely, is precisely the sort of unwarranted discrimination that the ADA sought to abolish.

To the extent that Albertson's contends that DOT vision requirements governing the qualifications of truck drivers constitute a floor, not a ceiling, and that it is free to adopt more restrictive standards than are set forth in the regulations, it misperceives the nature and purpose of the FHWA waiver program. The waiver program was designed to bring the DOT regulations into compliance with the requirements of the ADA and serves to protect disabled persons against unfounded discrimination. More important for our purposes, however, the individuals who secure waivers under the program have been determined to be safe drivers. It is evident, therefore, that however one views the other parts of the DOT regulations, the waiver program does not provide a floor for employers; rather it precludes them from declaring that persons determined by DOT to be capable of performing the job of commercial truck driver are incapable of performing that job by virtue of their disability.[11]

Albertson's may, in other respects, be able to adhere to stricter standards than those contained in federal regulations. But when the stricter standards it adopts screen out people with disabilities in contravention of a federal program designed both to protect the public safety and ensure compliance with the ADA, it will not be able to avoid the Act's strictures by showing that its standards are necessary to prevent a direct safety threat. To put it another way, the FHWA has already determined that the regular DOT vision standards, if applied across the board, would unnecessarily discriminate against visually impaired drivers in violation of the ADA. It has also determined that some visually impaired drivers who cannot meet the regular standards are nevertheless safe, competent drivers. In light of the agency's determination that waiver recipients do not pose a threat to public safety, we conclude that Albertson's is precluded from asserting that they do.

## CONCLUSION

In short, we conclude that if the facts are as Kirkingburg alleges, he suffers from a disability and is therefore protected by the provisions of the ADA. We further conclude that in establishing its job-related prerequisites, Albertson's cannot selectively adopt and reject federal safety regulations when the effect of its selective adoption and rejection is to discriminate against truck drivers with disabilities. Albertson's job requirement, which screens out otherwise qualified individuals with disabilities, is invalid.

Because Kirkingburg's failure to satisfy the discriminatory prerequisite served as the sole basis for the granting of summary judgment in favor of Albertson's, we reverse the district court's award and remand for further proceedings.

**REVERSED and REMANDED.**

RYMER, Circuit Judge, dissenting:

The majority subjects Albertson's to liability under the ADA for requiring a commercial truck driver to comply with the visual acuity regulations of the Department of Transportation as an essential function of his job rather

---

**10.** It bears mentioning once again that, prior to offering Kirkingburg a job, Albertson's gave him a 16–mile road test. He performed well on the test and demonstrated to Albertson's transportation manager that he had "superior driving skill to operate safely the type of commercial vehicles listed above." In fact, the record as a whole demonstrates clearly, and without a hint of any contrary evidence (other than the fact of his monocular vision), that Kirkingburg is eminently qualified for the job of commercial truck driver.

**11.** Albertson's does not contend that it is entitled to adopt vision standards that are more stringent than those contained in the federal regulations, including the waiver program, because the work its drivers perform is substantially different from the work performed by other commercial truck drivers. We express no view as to how such an argument would fare in a case in which it was properly presented.

than letting him participate in an experimental program that waived those requirements but had not been found safe. I must dissent.

Complying with current DOT safety requirements was an essential function of Kirkingburg's job at Albertson's.[1] There is no dispute that his eyesight didn't meet them. He could not be certified. But several months before he lost his certification, the FHWA decided to select a group of experienced monocular drivers with clean safety records to be licensed for a three year study of the relationship between visual disorders and commercial motor vehicle safety. Kirkingburg says that he could have performed the essential functions of his job by virtue of a waiver, and that in any event, his disability should have been accommodated by allowing him a leave of absence to get one.

The problem is that DOT vision regulations were adopted for public safety. The version in effect in November 1992, when Kirkingburg failed to get certified, had been on the books since 1970. Although numerous studies had been conducted to determine whether vision requirements for monocular drivers could safely be changed, the FHWA found no sufficient basis for doing so as recently as July 16, 1992.[2] See 57 Fed.Reg. 31458 (1992). That's why the FHWA decided to conduct a study to gather empirical data on monocular drivers, and to grant waivers on a limited basis to an experimental group. See Id. Even so, the FHWA had not determined that the existing regulations could safely be waived albeit experimentally for monocular drivers. That is why the D.C. Circuit held that the waiver program itself was invalid; the agency had not made the required finding that a waiver was "consistent with the safe operation of commercial motor vehicles" as required by statute. Advocates for Highway and Auto Safety v. Federal Highway Admin., 28 F.3d 1288, 1289 (D.C.Cir.1994).

Neither Kirkingburg nor the majority explains why the ADA should force Albertson's to assume the risk of waiving vision requirements that the FHWA itself had not found could be safely waived. Instead, the majority says that because the FHWA determined in *1994* that the vision study was safe enough to continue, Albertson's cannot say that in *1992* its requirement of complying with the vision regulations and rejecting a waiver was justified on account of safety. But the syllogism is flawed:

1. The majority starts with the premise that the dispositive question is "whether Albertson's job-related requirement that Kirkingburg fails to meet is lawful as applied." Whatever this means in the context of the ADA (where the real question is whether the employee is a "qualified individual with a disability who, with or without accommodation, can perform the essential functions of the employment position," 42 U.S.C. § 12111(8)), it cannot be the case that requiring compliance with DOT safety regulations is unlawful. Nor can it become unlawful "as applied" when the alternative is a waiver available only to an experimental group of drivers in a study that no one had found was consistent with the safe operation of commercial motor vehicles.

2. Next, the majority asserts that Albertson's has not "simply conformed its job requirements to the relevant DOT regulations; rather, it has chosen to adhere to only a part of the regulations, while ignoring the waiver program." However, Albertson's did not pick and choose regulations: the regulations hadn't changed in November of 1992 (and still haven't). It conformed its conduct precisely to the regulations in effect. The vision study waiver program was not part of the regulations, nor was it "a portion of the federal scheme" to prevent discrimination that Albertson's impermissibly rejected, as the majority suggests. Rather, the vision study waiver program was part of the FHWA's "efforts to review, and to eventually amend, its vision requirements through a rulemaking action." 57 Fed.Reg. 31458, 31458 (1992). As the agency explained,

---

1. Kirkingburg contends that the essential function of his job was being certified by DOT, not being in compliance with its regulations. However, there is no evidence that Albertson's ever accepted a waiver or defined the essential function of driving its commercial vehicles as anything less than complying with DOT visual acuity standards.

2. See *Rauenhorst v. Department of Transp.*, 95 F.3d 715 (8th Cir.1996) (outlining history).

the waiver program will enable the FHWA to conduct a study comparing a group of experienced, visually deficient drivers with a control group of experienced drivers who meet the current Federal vision requirements. This study will provide the empirical data necessary to evaluate the relationships between specific visual deficiencies and the operation of CMVs. The data will permit the FHWA to properly evaluate its current vision requirement in the context of actual driver performance, and, if necessary, establish a new vision requirement which is safe, fair, and rationally related to the latest medical knowledge and highway technology.

*Id.* In short, the vision waiver study was not a rule or a regulation with the force of law. It was a test, and an invalid test at that (as the D.C. Circuit held), for no determination had been made that waiving the vision requirements would not adversely affect the safe operation of commercial vehicles.

3. Next, the majority says that the waiver program "has been adjudged a success by the FHWA." Whether that's so or not, the determination referred to is the FHWA's "Notice of Final Determination and change in research plan" issued November 17, 1994—two years after Kirkingburg lost his job. 59 Fed.Reg. 59386, 59389 (1994). But it doesn't matter what the FHWA *now* thinks about the safety of its waiver study program. Whatever it had learned as a result of two years worth of the experiment wasn't known to Albertson's in November 1992, or to the agency at the time the study was begun in July 1992. As Kirkingburg seeks damages for his November 1992 termination, not reinstatement, the 1994, post-*Advocates* determination is simply irrelevant.

4. Finally, having said that Albertson's adhered to only part of the regulations because it ignored the waiver program, and that the waiver program is a success, the majority concludes that the waiver program "is a lawful and legitimate part of the DOT regulatory scheme" which Albertson's cannot say was not safe. Thus it holds that Albertson's "cannot selectively adopt and reject federal safety regulations" in establishing its job-related prerequisites, and that its job requirement is invalid. But since the vision study waiver program never was (and still isn't) a part of the regulations; and since it wasn't a success at the time of Kirkingburg's termination because it hadn't gotten off the ground and wasn't determined to be safe; and since it never was (and still isn't) a part of any regulatory scheme, there is no basis for holding that Albertson's job requirement is invalid. Nor is there any authority for estopping Albertson's, which is a private employer with legal responsibility to the public for the safety of its commercial motor vehicle drivers, from asserting that it wasn't required to accept a waiver, or that it wasn't reasonable for it to decline to do so, on the grounds of safety. To me it is dispositive that at the time of Kirkingburg's termination (and in this record), no one (including the FHWA) had determined that a waiver was safe.

For these reasons, I agree with the district court that Kirkingburg failed to show that he could perform the essential functions of his job because he did not meet the DOT visual requirements, and that the ADA does not require Albertson's to accept an experimental waiver that the FHWA had not found consistent with the safe operation of commercial motor vehicles. Since Albertson's offered to accommodate Kirkingburg's disability by another job (which Kirkingburg rejected), it fulfilled its ADA obligations. I would, therefore, affirm.