**ADVOCATES FOR HIGHWAY AND AUTO SAFETY, Petitioner,**

v.

**FEDERAL HIGHWAY ADMINISTRATION, Respondent.**

No. 92–1411.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 15, 1993.

Decided Aug. 2, 1994.

---

Henry M. Jasny, argued the cause and filed the briefs for petitioner.

Robert V. Zener, Appellate Litigation Counsel, U.S. Dept. of Justice, argued the cause and filed the brief for respondent. Peter J. Plocki, Trial Atty., and Paul M. Geier, Asst. Gen. Counsel for Litigation, U.S. Dept. of Transp., and Deborah Ruth Kant, Attorney, U.S. Dept. of Justice, entered appearances for respondent.

Linda Denison Kilb, was on the brief for amici curiae Robert L. Carpenter and John C. Mike Thatcher.

Erika Ziebarth Jones, Kathryn Ann Kusski, and Daniel R. Barney, entered appearances for amicus curiae American Trucking Ass'n.

Before BUCKLEY and RANDOLPH, Circuit Judges, and LEVIN H. CAMPBELL,* Circuit Judge, U.S. Court of Appeals for the First Circuit.

Opinion for the Court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Federal Highway Administration ("FHWA") sets driver safety qualifications for commercial motor vehicles operating in interstate commerce, including minimum vision requirements. The FHWA recently established a program allowing drivers with impaired vision in one eye to apply for waivers from the federal vision standard. Advocates for Highway and Auto Safety urge us to vacate the rule instituting the waiver program. We vacate and remand the rule because the agency lacked the data necessary to support its determination that the vision waiver program "is consistent with the safe operation of commercial motor vehicles." 49 U.S.C.App. § 2505(f) (1988).

## I. BACKGROUND

This case arises under the Motor Carrier Safety Act of 1984, codified at 49 U.S.C.App. §§ 2501–20 (1988) ("Safety Act"). Under the Safety Act, the Secretary of Transportation is directed to issue regulations establishing "minimum Federal safety standards" to "ensure that . . . the physical condition of operators of commercial motor vehicles is adequate to enable them to operate such vehicles safely." *Id.* § 2505(a)(3). The Act allows the Secretary to waive the application of any regulation in accordance with the following procedure:

§ 291(a).

* Sitting by designation pursuant to 28 U.S.C.

After notice and an opportunity for comment, the Secretary may waive, in whole or in part, application of any regulation issued under this section with respect to any person or class of persons if the Secretary determines that such waiver is not contrary to the public interest and is consistent with the safe operation of commercial motor vehicles.

*Id.* § 2505(f). The Secretary has delegated his authority under the Act to the Federal Highway Administrator. 49 C.F.R. § 1.48(aa) (1993).

The current regulation establishing the vision standard for drivers of commercial motor vehicles ("CMV") engaged in interstate commerce requires, in part, that such drivers have "distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen)." 49 C.F.R. § 391.41(b)(10). This standard does not apply to state-licensed drivers who are engaged solely in intrastate commerce.

On February 28, 1992, the FHWA published an "[a]dvance notice of proposed rulemaking" requesting comments "on the need, if any, to amend its driver qualification requirements relating to the vision standard ... [that] sets forth minimum vision requirements for drivers of commercial motor vehicles (CMV) operating in interstate commerce." 57 Fed.Reg. 6,793, 6,793, col. 1 (1992). Before the time for comments had expired, the FHWA published a "[n]otice of intent to accept applications for waivers" from the vision requirement. 57 Fed.Reg. 10,295 (1992) ("March 25th Notice"). The notice stated that applications would be "processed as quickly as possible" and that "[w]aiver[s] will be issued for a period of three years or until the current rulemaking addressing the FHWA's vision requirement is completed, whichever occurs first." *Id.* at 10,296, col. 1. The notice imposed certain conditions and reporting requirements on applicants, among them that applicants for a waiver submit a certification that their "visual acuity [be] at least 20/40 (Snellen), corrected or uncorrected, in the better eye." *Id.,* col. 3. In other words, applicants could be blind in one eye so long as the other was correctable to 20/40. The notice did not invite comment.

Criticized for failing to allow public comment on the March 25th Notice, the FHWA published a subsequent notice "announc[ing] the receipt of applications by drivers for waiver of the FHWA's vision requirements" and seeking "comments on its intent to waive its vision requirements for drivers that meet certain conditions." 57 Fed.Reg. 23,370, 23,-370, col. 1 (1992) ("June 3rd Notice"). This notice stated that "[a]fter the comment period has closed and the comments have been analyzed," the FHWA would "publish in the Federal Register a notice of final disposition on the waiver program." *Id.,* col. 1. The notice explained that

> the proposed waiver program will enable the FHWA to conduct a study comparing a group of experienced visually deficient drivers with a control group of experienced drivers who meet the Federal vision requirements. This study will provide the empirical data that [a previous study did] not.

*Id.,* col. 3.

In its "[n]otice of final disposition," the FHWA instituted the waiver program, making temporary waivers available to drivers who met certain conditions. 57 Fed.Reg. 31,458 (1992) ("Notice of Final Disposition"). Discussing the statutory requirement that it find that the "waiver is not contrary to the public interest," 49 U.S.C.App. § 2505(f), the FHWA stated that the program "is consistent with the national policy, as expressed in the Rehabilitation Act of 1973 and the [Americans with Disabilities Act], to facilitate the employment of qualified individuals with disabilities." 57 Fed.Reg. at 31,459, col. 3. Moreover, the FHWA found the waiver program "consistent with the safe operation of commercial motor vehicles," 49 U.S.C.App. § 2505(f), because the program's requirements "will effectively screen out unsafe drivers." *Id.* at 31,460, col. 1.

These safeguards require waiver applicants to hold a valid state commercial driver's license ("CDL") or a non-CDL license to operate a CMV issued after April 1, 1990. *Id.,* cols. 2–3. The applicant must also have three years' recent experience driving a CMV without: (1) license suspension or revocation; (2) involvement in a reportable acci-

dent in which the applicant received a citation for a moving violation; (3) conviction for driving a CMV while intoxicated, leaving the scene of an accident involving a CMV, commission of a felony or more than one serious traffic violation involving a CMV; or (4) more than two convictions for any other moving violation in a CMV. *Id.*, col. 3. Finally, the applicant must present proof from an optometrist or ophthalmologist certifying that the applicant's visual deficiency has not worsened since his last examination by the State licensing agency, that vision in one eye is at least 20/40 (corrected or uncorrected), and that the applicant is "able to perform the driving tasks required to operate a commercial motor vehicle." *Id.*

In addition, the applicant must comply with the following procedures: (1) report every citation for a moving violation involving a CMV to the FHWA within 15 days; (2) report the disposition of the charge within 15 days; (3) report "any accident involvement whatsoever" within 15 days; (4) submit documentation of an examination by an ophthalmologist or optometrist at least 15 days before the anniversary of the effective date of the waiver, including the examiner's certification that the individual is still eligible and that his vision deficiency has not worsened since the last examination; and (5) submit monthly reports of the number of miles driven, the number of nighttime and daylight hours driven, and the number of days the vehicle was not operated. *Id.* at 31,461, cols. 1–2.

Advocates for Highway and Auto Safety, a consortium of insurance companies, law enforcement agencies, and public interest groups, challenge the final rule on the grounds that the FHWA gave inadequate opportunity for public comment, that the waiver program violates the intent of Congress as set forth in the Safety Act, and that in promulgating the waiver program, the FHWA acted in an arbitrary and capricious manner.

## II. Discussion

### A. Public Comment as a Prerequisite to Informed Decisionmaking

■ The March 25th Notice, which announced the FHWA's intention to issue temporary waivers, was promulgated without opportunity for comment—a practice we have warned against. In *National Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C.Cir.1978), we stressed the importance of the Administrative Procedure Act's "requirement that the parties be able to comment on the rule while it is still in the formative or 'proposed' stage ... [to ensure] that the agency maintains a flexible and open-minded attitude." The FHWA contends, however, that because the June 3rd Notice changed the terms of the March 25th Notice, the latter was implicitly revoked. Thus the agency urges us to examine the June 3rd Notice on its own terms, as if the March 25th Notice had never existed.

We take this explanation with several grains of salt. To treat the second notice as if it stood alone would ignore the possibility that the policy announced on March 25 might have solidified to the point where any comments offered in response to the later invitation would fall on deaf ears. Furthermore, the June 3rd Notice explicitly built on the earlier announcement: "To conform with the March 25 notice and to expedite the waiver process, the FHWA will continue to accept applications for waiver of the vision requirements...." 57 Fed.Reg. at 23,370, col. 1. Moreover, the Notice of Final Disposition described the June 3rd Notice as a "supplement" to the March 25th Notice, intended merely to "modif[y] some of the program's conditions, clarif[y] some of its details, and request[ ] comments ... on the proposed vision waiver program." 57 Fed.Reg. at 31,-458, cols. 1–2. Admittedly, the June 3rd Notice stated that the conditions of the program "are only proposed and may undergo further change before finally approved after the public comment period." *Id.* at 23,370–71. Nonetheless, we feel that the references in the June 3rd Notice and the Notice of Final Disposition clearly show that the agency effectively promulgated the waiver program in the earlier notice and did so without allowing opportunity for comment.

We find, therefore, that the March 25th Notice remained in effect even though modi-

fied by the later notices. The FHWA's tardy request for public comment, however, is not necessarily fatal. "[D]efects in an original notice may be cured by an adequate later notice ... but that curative effect depends on the agency's mind remaining open enough at the later stage." *McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1323 (D.C.Cir.1988) (citation omitted). The touchstone of our inquiry is thus the agency's open-mindedness, because the concern is that "an agency is not likely to be receptive to suggested changes once the agency puts its credibility on the line in the form of final rules." *Air Transport Ass'n of America v. Dep't of Transp.,* 900 F.2d 369, 379 (D.C.Cir. 1990) (internal quotation marks and brackets omitted). We therefore place the burden on the agency to make a compelling showing that the defects of its earlier notice were cured by the later one. *Id.* at 379–80 (agency can overcome presumption of closed mind only by making a "compelling showing" that it considered subsequent comments with an open one).

As part of our inquiry, we examine whether the "language of the [agency's] published replies suggest that the agency had afforded the comments particularly searching consideration." *Id.* at 380. Here the FHWA notes that the conditions attached to the grant of a waiver had been modified between the establishment of the vision waiver program on March 25th and the request for comments of June 3rd and argues that this is evidence that the agency had an open mind when it issued the March 25th Notice. Yet this misstates the inquiry: What is at issue is whether the FHWA displayed an open mind when considering the comments received *in response to* the June 3rd request.

■ Advocates contend that the FHWA's closed-mindedness is evidenced by its failure to make changes or revisions to the proposed waiver program in response to the public comments. While changes and revision are indicative of an open mind, *see Air Transport,* 900 F.2d at 380, an agency's failure to make any does not mean its mind is closed. Either way, it is the agency's burden to persuade the court that it has accorded the comments a full and fair hearing.

As further evidence that the FHWA gave the comments only cursory examination, Advocates point to the four-day interval between the close of the public comment period on July 6, 1992, and the issuance of the Notice of Final Disposition on July 10, 1992, six days prior to its publication in the *Federal Register.* They also observe that the FHWA's discussion of comments occupied less than one page in the *Register.* See 57 Fed.Reg. at 31,458, col. 3. In response, the FHWA notes that of some fifty comments received, only four opposed the waiver program; and these largely repeated comments previously received in response to the February 28, 1992, advance notice of proposed rulemaking.

We are aware, of course, that "[c]onsideration of comments as a matter of grace is not enough." *McLouth,* 838 F.2d at 1323. It must be made with a mind that is open to persuasion. We are satisfied that that was the case here. The FHWA gave careful thought to each of the four opposing comments. The first of these criticized the FHWA for invoking the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 as justifications for the waiver program. 57 Fed.Reg. at 31,458, col. 3. While the agency conceded that neither of these acts mandated revisions to the driver qualification standards, it nonetheless stated that the goals of these two Acts "should be important factors in the FHWA's decisionmaking process." *Id.* at 31,459, col. 1. The second comment argued that the existing empirical data indicated that a more stringent vision requirement was needed. *Id.* The FHWA disputed this claim, stating that existing studies "do not provide a sufficient nexus between the current vision requirements and driving performance ... [and that] the data collected from the ... vision waiver program will provide the necessary information to proceed with rational, performance-oriented rulemaking." *Id.*

A third comment argued that the FHWA had failed to meet its statutory responsibility of ensuring that its actions enhance the safety of commercial motor vehicles. *Id.* In response, the agency noted that its obligation was only to ensure " 'that such waiver is not

contrary to the public interest and is *consistent* with the safe operation of commercial motor vehicles.'" *Id.* (quoting, with emphasis, 49 U.S.C.App. § 2505(f)). The final adverse comment criticized the agency for allowing any relaxation of the vision requirements. *Id.*, col. 2. The agency responded that it "is not relaxing its vision requirements ... [Instead] the program permits conditional waivers from the regulatory requirements in order to test their efficacy." *Id.* A review of the comments submitted and the responses made persuades us that the agency approached the post-promulgation comments with the requisite open mind. We therefore conclude that the FHWA satisfied its obligation to consider public comment on the waiver program.

B. Was the Vision Waiver Program Arbitrary and Capricious or Otherwise Contrary to Law?

The Administrative Procedure Act requires us to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). The Safety Act stipulates that the FHWA may grant waivers only if it "determines that such waiver is not contrary to the public interest and is consistent with the safe operation of commercial motor vehicles." 49 U.S.C.App. § 2505(f). Advocates argue that the FHWA made neither of the requisite determinations; as we agree that the agency made the latter without the necessary factual support, we do not consider the former.

Unfortunately for the FHWA, its Notice of Final Disposition acknowledged that a study it had commissioned had

illuminated the lack of empirical data to establish a link between vision disorders and commercial motor vehicle safety. The study also failed to provide a sufficient foundation on which to propose a satisfactory vision standard for drivers of CMVs in interstate commerce.

57 Fed.Reg. at 31,458, col. 2. As a consequence, the FHWA justified the adoption of the waiver program as enabling it to conduct a study that

will provide the empirical data necessary to evaluate the relationships between specific visual deficiencies and the operation of CMVs[ ] ... [and] will permit the FHWA to properly evaluate its current vision requirement in the context of actual driver performance, and, if necessary, establish a new vision requirement which is safe, fair, and rationally related to the latest medical knowledge and highway technology.

*Id.*, cols. 2–3.

Although this approach to developing a new standard may be entirely reasonable, it is not "in accordance with [the applicable] law," which explicitly requires the FHWA to make a prior determination that a waiver is "consistent with the safe operation of commercial motor vehicles." 49 U.S.C.App. § 2505(f); *cf. United Mine Workers of Am. Int'l Union v. Dole,* 870 F.2d 662 (D.C.Cir. 1989) (where statute requires that new regulations afford "no less protection" than their predecessors, that requirement is an "explicit constraint on the Secretary's authority"). Notwithstanding the conceded dearth of data, the agency found that "the waiver program's conditions enable the FHWA to find that such waivers are 'consistent with the safe operation of commercial motor vehicles.'" 57 Fed.Reg. at 31,459, col. 3 (quoting 49 U.S.C.App. § 2505(f)). It so concluded because the program's conditions would sufficiently ensure that "[a]ll drivers eligible for a waiver have proven experience and have demonstrated their ability to safely operate a CMV for a number of years." *Id.*

"Safely operate," however, is a relative term; and the FHWA's statement begs the question whether those sight-impaired drivers will be able to operate their CMVs with the same degree of safety as those who meet the agency's current vision standards. Since their establishment in the late 1930's, the federal government's vision standards have been successively tightened. 57 Fed.Reg. 10,295, col. 2. The current regulations "prescribe 'absolute' vision standards with virtually no possibility of a waiver." *Id.* Thus the vision waiver program represents a significant departure from the FHWA's prior policy, a departure the agency bears a special burden in justifying. "The key is whether

the agency changed its policy only after reasoned consideration of relevant factors." *Western Union Int'l, Inc. v. FCC,* 804 F.2d 1280, 1291 (D.C.Cir.1986).

Here, the FHWA acknowledged that its recently commissioned study on the link between visual disorders and CMV safety "failed to provide a sufficient foundation on which to propose a satisfactory vision standard for drivers of CMVs in interstate commerce." 57 Fed.Reg. at 31,458, col. 2. An explicit purpose of the waiver program is to "enable the FHWA to conduct a study comparing a group of experienced, visually deficient drivers with a control group of experienced drivers who meet the current Federal vision requirements" that will provide "the empirical data necessary to evaluate the relationships between specific visual deficiencies and the operation of CMVs." *Id.* at cols. 2–3. Thus, the agency initiated a program to issue temporary waivers to visually impaired drivers in order to procure the hard evidence needed to determine the effect of visual deficiencies on safety. Yet, before it may grant a waiver, the Safety Act requires the agency to "determine[ ] that such waiver ... is consistent with the safe operation of commercial motor vehicles." 49 U.S.C.App. § 2505(f). As counsel for the FHWA acknowledged at oral argument, in order to satisfy that requirement, the agency must find that there will "not be any diminution of safety resulting from the waiver." Tape of Oral Argument, November 15, 1993.

The FHWA thus finds itself in the awkward position of asserting that it needs the waiver program "to evaluate the relationships between specific visual deficiencies and the operation of CMVs" while simultaneously determining that the program will not result in a diminution of safety standards. Because its determination that the waiver program will not adversely affect the safe operation of CMVs is devoid of empirical support in the record, we must consider it conclusory. The FHWA, however, cannot "ma[ke] conclusory assertions that its decision had no safety cost at all." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.,* 956 F.2d 321, 324 (D.C.Cir.1992). As the FHWA has failed to meet the exacting requirements of section 2505(f), we conclude that the adoption of the waiver program was contrary to law.

### III. CONCLUSION

In so concluding, we are fully aware of the difficulties that the FHWA undoubtedly faces in acquiring the data on which to make an informed judgment as to whether the existing vision standards may safely be relaxed. The requirements of the Motor Carrier Safety Act's waiver provision, however, must be satisfied; and because the FHWA has failed to meet its requirements, we vacate and remand the rule.

*So ordered.*