Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 5, 2005   Decided January 20, 2006

No. 04-1436

FEDERAL EXPRESS CORPORATION,
PETITIONER

v.

DEPARTMENT OF TRANSPORTATION AND
NORMAN Y. MINETA, SECRETARY, UNITED STATES
DEPARTMENT OF TRANSPORTATION,
RESPONDENTS

On Petition for Review of an Order of the
United States Department of Transportation

*Walter Dellinger* argued the cause for petitioner.  With him on the briefs were *Matthew D. Roberts* and *Cynthia J. Collins*.

*Matthew M. Collette*, Attorney, U.S. Department of Justice, argued the cause for respondent.  With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Leonard Schaitman*, Attorney, *Jeffrey A. Rosen*, General Counsel, U.S. Department of Transportation, *Paul M. Geier*, Assistant General

Counsel, *Dale C. Andrews*, Deputy Assistant General Counsel, and *Peter J. Plocki*, Senior Litigation Counsel.

Before: HENDERSON, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Eleven days after the terrorist attacks of September 11, 2001, Congress enacted the Air Transportation Safety and System Stabilization Act. The Act directed the President to compensate air carriers up to five billion dollars for "direct losses" caused by orders halting air traffic and for "incremental losses" directly caused by the terrorist attacks and incurred between September 11 and December 31, 2001. Compensation was not to exceed those losses proved "to the satisfaction of the President." A cost savings rule promulgated by the Secretary of the Department of Transportation established a presumption that "[t]he Department generally does not accept claims by air carriers that cost savings should be excluded from the calculation of incurred losses." The Federal Express Corporation challenges the rule as being contrary to the Act and the Secretary's rejection of sworn affidavits in support of some of its claims as arbitrary, capricious, and contrary to law under the Administrative Procedure Act. We deny the petition for review.

## I.

At 9:25 on the morning of September 11, 2001, the Federal Aviation Administration issued a ground stop order to bring all aviation in the United States to an immediate halt. *See* NAT'L COMM'N ON THE TERRORIST ATTACKS UPON THE U.S., THE 9/11 COMMISSION REPORT 25 (2004). In response to that order and the decline in air traffic following September 11, Congress passed the Air Transportation Safety and System Stabilization

Act, which the President signed on September 22, 2001. *See* Pub. L. No. 107-42, 115 Stat. 230 (2001)(codified at 49 U.S.C. § 40101 note) ("Act"). Section 101(a)(2) of the Act provides that the President shall

> [c]ompensate air carriers in an aggregate amount equal to [five billion dollars] for (A) direct losses incurred . . . by air carriers as a result of any Federal ground stop order . . . and (B) the incremental losses incurred beginning September 11, 2001, and ending December 31, 2001, by air carriers as a direct result of such attacks.

An "'incremental loss' does not include any loss that the President determines would have been incurred if the terrorist attacks . . . had not occurred." *Id.* § 107(3). For any loss to be compensable, it must be "demonstrate[d] to the satisfaction of the President." *Id.* § 103(a).

The Secretary of the Department of Transportation promulgated a series of regulations to carry out the Act. *See* 66 Fed. Reg. 54,616 (Oct. 29, 2001); 67 Fed. Reg. 250 (Jan. 2, 2002); 67 Fed. Reg. 18,468 (Apr. 16, 2002); 67 Fed. Reg. 54,058 (Aug. 20, 2002); *see also* 66 Fed. Reg. 49,507 (Sept. 25, 2001). "In order to fulfill Congress' intent to expeditiously provide compensation to eligible air carriers," the Department would make an initial payment of roughly fifty percent of a carrier's estimated losses, and two later installments to reach full compensation. 66 Fed. Reg. at 54,616-17. As a starting point in determining the amount of a carriers's compensation, the Department would compare "the difference between pre-September 11 forecasts and the updated forecasts or actual results." 67 Fed. Reg. at 18,472. The resulting difference would "provide[] an approximation of the incremental losses that are a direct result of the attacks, and that approximation, without more,

[would] give[] effect to the language of the statute." *Id.* This methodology was based on two assumptions: (1) the differences between a carrier's forecast and its actual results are primarily due to September 11; and (2) "it is extremely difficult if not impossible to distinguish, on a line item by line item basis, individual revenue and expense items that were affected directly by the terrorist attacks from those that were affected indirectly, or those that were partially affected, or not affected at all." *Id.*

The regulations left room, however, for adjustments to address items of "significant relative financial impact" that were "extraordinary or non-recurring" and unrelated to September 11. *Id.* at 18,473. For instance, an adverse $1 million judgment that occurred during the compensation period as a result of operative facts before September 11 could not be included as a compensable net loss. *Id.* The regulations also contemplated that there would be situations in which carriers experienced "a reduction in actual versus forecast expenses." *Id.* To address those situations, the cost savings rule provides:

> The Department generally does not accept claims by air carriers that cost savings should be excluded from the calculation of incurred losses. Consequently, the Department will generally not allow such claims to be used in a way that has the effect of increasing the compensation for which an air carrier is eligible.

14 C.F.R. § 330.39(b) (2005). The rule reflected a general presumption against such adjustments because: (1) cost reductions unrelated to September 11 would be expected to have been included in pre-September 11 forecasts; (2) it is "highly likely that expense reduction efforts undertaken after September 11 were attributable, implicitly if not explicitly, to changed expectations regarding revenues after the attacks"; (3) cost savings "in fact reduce an air carrier's losses, and the

calculations required under [the] rules may not be manipulated to exclude actual reductions in expenses, thereby generating a basis for increased compensation"; and (4) Congress intended that carriers not receive compensation for cost savings, "which they have an independent obligation to their managements and shareholders to achieve, and which it is reasonable to expect them to undertake to mitigate the need for compensation under the Act." 67 Fed. Reg. at 18,473. Carriers were instructed to submit their calculations of revenues and expenses on Department "Form 330" along with sworn financial statements reviewed by an independent public accountant. *See* 14 C.F.R. §§ 330.27, 330.33; *id.* pt. 330, app. A.

FedEx sought compensation under the Act, and based on FedEx's initial loss estimates, the Department paid it just over $100 million in the first round of payments. In subsequent applications FedEx recalculated its projected losses. When FedEx closed its books for the compensation period, however, instead of comparing its pre-September 11 forecast with its actual revenues and expenses during the compensation period on Form 330, FedEx adjusted its actual results to account for cost savings that it describes on appeal as "variances in its fixed expenses [that] were not a result of the attacks, because those expenses would not automatically decline with reduced business." Petitioner's Br. at 8-9.

The Secretary, upon FedEx's appeal, upheld, with some modifications, the initial decision of the Assistant Secretary for Aviation and International Affairs generally rejecting FedEx's attempt to obtain compensation for cost savings. Noting that the Act provided compensation for "losses incurred," the Secretary understood FedEx as "essentially seeking additional compensation in this appeal for expenses that were never actually incurred." Final Decision at 2. In the Secretary's opinion, FedEx would receive a "windfall" were its appeal

granted because it would end up with profits greater than those it had forecasted before September 11. *Id.* Upon examining FedEx's claims for adjustments due to cost savings, however, the Secretary granted some and denied others. Some he allowed because FedEx had shown that the cost savings had originated before September 11 and thus could not have been related to the terrorist attacks; others he rejected because adjustment would effectively be a double payment to FedEx for expenses that were not incurred, and which are not properly compensable because FedEx would not incur them until after the compensation period; still others he rejected because FedEx had failed to show the cost savings were unrelated to September 11. In all, the Secretary determined that FedEx was entitled to receive just under $72 million in compensation for lost profits as a result of the September 11 attacks. FedEx petitions for review.

## II.

An earlier challenge to the cost savings rule was dismissed by the court as unripe. *See Federal Express Corp. v. Mineta*, 373 F.3d 112, 118-19 (D.C. Cir. 2004) ("*FedEx I*"). Now that the Secretary has issued a Final Decision on FedEx's compensation claims, the question whether Congress's use of the term "losses incurred" forecloses the Secretary's adoption of a methodology that generally denies adjustments when a carrier's expenses are lower than it forecasted prior to September 11 is properly before the court. In *FedEx I*, the court concluded, upon applying the first step of the familiar analysis of *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984), that the meaning of "incurred" in section 101(a)(2) is ambiguous, with "the only metric" in the Act being "'the satisfaction of the President.'" *FedEx I*, 373 F.3d at 116. Use of that metric, the court observed, "vests the Executive 'with broad discretion to determine appropriate criteria' for the award of compensation to an air carrier with better-than-expected results

for the period September 11-December 31, 2001." *Id.* (quoting *Natural Res. Def. Council, Inc. v. EPA*, 22 F.3d 1125, 1148-49 (D.C. Cir. 1994)). Given the grant of broad discretion to resolve this ambiguity, the court concluded that the definitions of "loss" as "something that is gone and cannot be recovered" and "incurred" as "liable or subject to, as in to incur debt," as implemented, were unquestionably permissible. *See FedEx I*, 373 F.3d at 117-18. Hence, the only question is whether the cost savings rule is among the permissible constructions of section 101(a)(2) of the Act.

FedEx contends that the statutory mandate to compensate carriers requires the Secretary to compensate air carriers for their direct and incremental losses from the September 11 attacks in order to put the carriers in the financial positions they would have been in if the attacks had not occurred. Thus, it argues, the Secretary could not adopt a rule that denied compensation based on financial need and had to allow adjustments whenever actual expenses or revenues deviated from a carrier's pre-September 11 forecast and were unrelated to September 11. FedEx maintains that the critical assumption underlying the Secretary's estimates, derived from a methodology comparing a carrier's pre-September 11 forecast with its actual revenues and expenses during the compensation period, is that all variances from the forecast were due to September 11. Although in applying the rule the Secretary generally made adjustments where costs were higher than forecasted, FedEx claims the Secretary applied a different rule where costs were lower than forecasted with the result that FedEx was worse off than if the September 11 attacks had never occurred. By using the term "cost savings," FedEx maintains, the Secretary "incorrectly implies that a carrier's management took affirmative action to reduce relevant expenses in response to [September 11]." Petitioner's Br. at 26-27. Rather than creating a rebuttable presumption, FedEx concludes, the cost savings rule denies adjustment for cost savings that did

not result from September 11, at least for carriers viewed by the Secretary to have insufficient financial need. From FedEx's perspective, then, the cost savings rule impermissibly discourages the exclusion of variances in which expenses are lower than the forecast by adopting a general presumption against such adjustments.

In *FedEx I*, the court observed that "it is simply implausible that the Congress intended to compensate cargo carriers for the direct losses they incurred as a result of the September 11-14 ground stop order even if they enjoyed better financial results overall for the period September 11-December 31, 2001," 373 F.3d at 117, because "the undisputed purpose of the Act was to 'stabilize an industry that [was] desperately in need of urgent relief,'" *id.* (quoting 147 CONG. REC. H5884 (daily ed. Sept. 21, 2001) (statement of Rep. Reynolds)). Congress "surely intended also that the [Secretary] 'pay out no more in subsidy than is currently needed to accomplish the purposes of the [Act].'" *FedEx I*, 373 F.3d at 117 (quoting *Trans World Airlines, Inc. v. Civil Aeronautics Bd.*, 385 F.2d 648, 667 (D.C. Cir. 1967)). We will assume that some cost savings during the compensation period were not necessarily related to September 11, that such cost savings were not necessarily the result of carrier management decisions, and that the rule could have distinguished between fixed and variable costs. Nonetheless, FedEx fails to acknowledge that determining carrier compensation under the Act is inherently inaccurate because of the impossibility of determining how a carrier would have performed had September 11 never occurred. The Secretary contemplated circumstances in which projections would vary from actual experience and concluded that it remains "extremely difficult if not impossible to distinguish" individual expenses that were or were not affected by the attacks. 67 Fed. Reg. at 18,472.

Given the situation after September 11, it was reasonable for the Secretary to adopt a general presumption in order to accomplish the statutory objectives with satisfactory speed. *See id.* at 18,472-73. The presumption is rational for the reasons stated in the rulemaking. *See id.* at 18,473. The Secretary could reasonably assume that significant cost reduction plans unrelated to September 11 would have been included in a carrier's pre-September 11 forecasts. In view of the enormous impact of September 11 on air carriers, the Secretary also could reasonably assume that, following the ground stop order and the terrorist attacks, carriers' conscious efforts to reduce costs "were attributable, implicitly if not explicitly, to changed expectations regarding revenues after the attacks." *Id.* Upon proof satisfactory to the Secretary, however, a carrier could rebut the general presumption as to a particular cost savings item.

Although FedEx maintains the cost savings rule is not a mere factual presumption, but a strict rule that barred FedEx, because it was profitable during the compensation period, from receiving adjustments for cost savings even if FedEx proved those savings were not due to September 11, its own experience demonstrates that the cost savings rule, as applied, was not a strict rule in which all claimed adjustments would be denied. The Secretary allowed some adjustments that increased the amount of FedEx's compensation and denied some fixed-expense adjustments that would have decreased the amount of FedEx's compensation. FedEx characterizes the rule as a "one-way ratchet" in that it favors cost savings adjustments that serve to reduce a carrier's compensation award. *See* Petitioner's Br. at 32 (citing 14 C.F.R. § 330.39(b)). But the Secretary, as we have explained, offered persuasive reasons for treating self-interested claims for greater compensation differently from adjustments that reduce a carrier's compensation award.

FedEx contends, however, that two of the Secretary's explanations for the cost savings rule are inconsistent with the Act. First, in FedEx's view, the Secretary's position that the cost savings losses were "never actually incurred" because these "'expenses' . . . were never actually paid" is illogical. FedEx points out that this reasoning confuses "losses incurred" with "expenses incurred." Under that reasoning, FedEx maintains, it would be irrelevant whether a reduction in expenses had anything to do with September 11 because all expense reductions involve expenses "not actually incurred." Even if scattered statements swept more broadly than the Secretary could have intended, we fail to see how that detracts from the validity of the Secretary's amply supported decision generally to disallow cost savings adjustments while at the same time giving carriers a fair opportunity to claim those adjustments when appropriate. *Cf. FedEx I*, 373 F.3d at 118 (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).

Second, FedEx challenges the Secretary's reliance on FedEx's overall profitability as a justification for denying it additional compensation for cost savings. Allowing higher compensation would not be a "windfall," in the sense of compensating carriers that benefitted as a result of the September 11 attacks, *see FedEx I*, 373 F.3d at 117, FedEx maintains, because FedEx would only be placed in the position it would have been in had the September 11 attacks not occurred. But FedEx fails to recognize that the Secretary could reasonably view a windfall to occur when a carrier receives greater profits than it had forecasted before September 11. More importantly, FedEx fails to identify any instance in which the Secretary rejected a claimed cost savings on the ground that FedEx was profitable. Instead, the Secretary evaluated FedEx's evidentiary submissions and found them inadequate for reasons unrelated to profitability. In context, the Secretary's statements about FedEx's finances reflect only an understandable disbelief that a

profitable company, which had already received more than $70 million in government funds, would insist that it was owed more money. The Secretary's references to FedEx's profitability therefore afford no basis to conclude that the cost savings rule was an impermissible interpretation of the Act.

FedEx's challenge under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), need not detain us long. Sworn financial statements are the primary method by which a carrier is to prove its claim under the Stabilization Act. *See* Act § 103(a). FedEx contends in seeking additional compensation that the Secretary's rejection of its sworn statements and affidavits as insufficient to rebut the regulatory presumption was arbitrary and capricious because it was based on mere conjecture. The Secretary was not obliged to accept FedEx's assertions at face value. As the records are under seal, it suffices to say that our review indicates that some of the affidavits, although quite detailed, were couched in conclusory terms unsatisfactory to the Secretary for reasons that were explained, while others acknowledged that expense reductions were subject to short-term management control. Still others related to types of expenses that the Secretary reasonably could conclude were subject to management control given the incentive to reduce expenses in response to the September 11 attacks. And still others gave the Secretary obvious reason to doubt FedEx's credibility. Overall, the statements and affidavits left significant gaps in relevant information or contained significant inconsistencies and weaknesses that gave the Secretary reasonable grounds to deny further compensation to FedEx under the Act.

FedEx also contends that because the Act explicitly contemplates that the Secretary "may audit such [sworn financial] statements," Act § 103(a), the Secretary may only reject an affidavit that he first audits. Nowhere does the Act require the President — or his delegate — to accept uncritically

conclusory explanations as to why particular claims constitute losses. He is required to be "satisfied." *See id.* "Indeed," as we explained in *FedEx I*, "the *only* metric the Act provides to determine whether an air carrier has incurred a loss . . . is 'the satisfaction of the President.'" *FedEx I*, 373 F.3d at 116 (emphasis added). The Secretary's reasonable position is that, in accordance with the Act, he will review affidavits to satisfy himself under section 103(a) that they make legitimate claims of "losses" related to September 11. The Secretary's separate audit authority does nothing to cast this position into doubt.

Accordingly, we deny the petition for review.